485 F.2d 1333
 UNITED STATES of America, Plaintiff-Appellee.
v.
Eugene SMALDONE, aka Checkers, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eugene Louis SMALDONE, aka Young Gene, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Guy McNULTY, aka Mickey, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin Daniel HANNERS, aka Mel, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leo Edward LANE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis Michael VALLEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael J. VALLEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Josef Richard ERNER, aka Rick, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frank Joseph GARCEO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harry Anthony VILLANO, Defendant-Appellant.
 Nos. 72-1854 thru 72-1863.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted May 23, 1973.
Decided Oct. 12, 1973.
Rehearing Denied in No. 73-1857 Oct. 25, 1973.
Rehearing Denied in Nos. 72-1854, 72-1855, 72-1858, 72-1860,
72-1861 and 72-1863 Oct. 26, 1973.
 
 John J. Flynn, Phoenix, Ariz. (Flynn, Kimerer, Thinnes & Galbraith and Richard L. Parrish, Phoenix, Ariz., on the brief, for defendants-appellants Eugene Smaldone, Eugene Louis Smaldone and Harry Anthony Villano; Leland S. Huttner, Denver, Colo., on the brief, for defendant-appellant Melvin Daniel Hanners; Paul E. Vranesic, II, Denver, Colo., on the brief, for defendant-appellant Josef Richard Erner), for defendants-appellants Eugene Smaldone, Eugene Louis Smaldone, Melvin Daniel Hanners, Josef Richard Erner, Leo Edward Lane, and Harry Anthony Villano.
 Richard T. Spriggs, Denver, Colo., for defendant-appellant Josef Richard Erner.
 H. D. Reed, Denver, Colo., for defendant-appellant Michael J. Valley.
 Walter L. Gerash, Denver, Colo. (Gerash & Gerash, and Louis M. Fischer, Denver, Colo., on the brief), for defendant-appellant Dennis Michael Valley.
 Leland S. Huttner, Denver, Colo., for defendant-appellant Melvin Daniel Hanners.
 Morris W. Sandstead, Jr., Boulder, Colo., for defendants-appellants Guy McNulty and Frank Joseph Garceo.
 Richard J. Spelts, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., and W. Allen Spurgeon, Asst. U. S. Atty., with him on the brief), for plaintiff-appellee.
 Before LEWIS, Chief Judge, LARAMORE*, Judge, Court of Claims, and McWILLIAMS, Circuit Judge.
 LEWIS, Chief Judge.
 
 
 1
 This was a criminal prosecution brought on a three-count indictment filed in the United States District Court for the District of Colorado. Counts I and II of the indictment charged fifteen defendants with knowingly and wilfully conducting, financing, managing, supervising and directing an illegal gambling business contrary to Colorado law and in violation of 18 U.S.C. Secs. 1955 and 2.
 
 
 2
 Count I covered the time period October 16, 1970 to on or about June 30, 1971 and named eight defendants. Count II covered the time period August 1, 1971 to on or about January 31, 1972 and named thirteen defendants. On count I the jury convicted appellants Eugene Louis Smaldone (Young Gene), Guy McNulty, and Melvin Daniel Hanners. On count II the jury convicted appellants Young Gene, McNulty, Eugene Smaldone (Checkers), Leo Edward Lane, Dennis Michael Valley (Dennis), Michael J. Valley (Mike), Josef Richard Erner, Frank Joseph Garceo, and Harry Anthony Villano.[1] In this consolidated appeal under 28 U.S.C. Sec. 1291 there are ten appellants, two of whom were convicted on both counts of the indictment.[2]
 
 
 3
 * THE EVIDENCE
 
 Title 18 U.S.C. Sec. 1955 states:
 
 4
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 
 
 5
 (b) As used in this section-
 
 
 6
 (1) "illegal gambling business" means a gambling business which-
 
 
 7
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 
 
 8
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 
 
 9
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 10
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 
 
 11
 (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
 
 
 12
 At trial the government attempted in each of the two counts to link five or more persons including some of the appellants to an illegal gambling business which was in operation "in excess of thirty days or [had] a gross business revenue of $2000.00 in any single day." In an attempt to meet the necessary elements of section 1955 the following evidence was produced at trial:
 
 
 13
 A widespread bookmaking operation involving a number of people in the Denver, Colorado area was in operation between October 16, 1970 and January 31, 1972. The government introduced evidence showing that at the apex of this operation was Checkers Smaldone with Young Gene Smaldone and Michael Tomeo (severed from the original trial) acting as the central bookmakers. The illegal gambling business centered around bookmaking on certain sporting events including college and professional football, basketball, baseball, and horseracing. Because of the seasonal nature of sporting events the indictment was divided into two counts. The first count covered gambling activities beginning with the fall of 1970 and ending June 30, 1971. The second count commenced with the start of the 1971 football season and ended January 31, 1972.
 
 
 14
 The bookmaking operation encompassed a number of different conductors[3] ] including: (1) runners (individuals who handled payoffs and collected from betting customers); (2) phone men (the middlemen who received bets from customers and exchanged betting information such as the "line" or point spread); (3) relay or pickup men (higher echelon functionaries who received and consolidated betting information from phone men, enabling phone men to then destroy any tangible evidence); (4) bookkeepers (men who acted as accountants for the gambling operation) and (5) managers (those individuals in supervisory and ownership positions). The purpose of having various categories of conductors was to insulate the more important individuals from the actual operation, and to maintain secrecy through limited encounters between participants.[4]
 
 
 15
 The gambling operation was of a complex nature. Generally, bets were made at a ratio of 11 to 10 with the odds in favor of the bookmaker. The customer could pyramid his bets by selecting as necessary winners a number of teams, called a parlay, or by reducing or enlarging the point spread established by the "line." A point spread or "line," which often was the basis of betting on football games, was given to customers who were usually also assigned "code numbers."
 
 
 16
 Weekly sports schedules listing games chronologically by starting times commencing on the east coast and moving west were distributed to participants. These schedules not only identified the teams involved but provided code numbers for the teams and blank boxes for scoring. Though published for sports enthusiasts, these special schedules were very helpful to the gambling operation in keeping track of numerous wagers and improving the exchange of information. With the help of sophisticated sports schedules, bets were placed with phone men and, after the relay men consolidated the various wagers, they were passed on to "management." The customer would then have his account tallied on a weekly basis, at which time he would either receive his winnings or pay his losses.
 
 
 17
 The various conductors were paid according to their importance within the organization. Some were provided salaries plus expenses including attorney's fees, bonds, and fines if apprehended by the police. Others were given a percentage of the profits from the customers with whom they dealt and of course the owners of the operation shared in the profits generated by the total gambling enterprise.
 
 
 18
 A. Count I.
 
 
 19
 Under count I the government offered evidence showing that the three appellants-Young Gene, McNulty and Hanners-jointly operated a gambling business with at least seven other conductors during the fall and winter of 1970-71. The government produced an array of witnesses including four who played personal roles in the alleged gambling operation. The thrust of their testimony revealed a number of links between various participants in a single gambling operation under the direction of Young Gene.
 
 
 20
 Larry Laningham, one of the government's major witnesses, testified that he had been hired by Young Gene and McNulty to be a "runner" in a bookmaking organization. Laningham was later elevated by Young Gene to be a relay man and eventually took over as a bookkeeper for the operation. Laningham stated that at various times during the count I period he had contact with all of the appellants as they pursued various aspects of the gambling operation. He also linked the appellants to each other and to other conductors.
 
 
 21
 The testimony of other witnesses painted the picture of a gambling organization that included a number of participants at various levels and with various degrees of involvement. The gambling activity generally centered around Young Gene Smaldone with appellants McNulty and Hanners playing lesser roles in the total scheme. Evidence was introduced showing that McNulty used Laningham as a driver on collections after hiring him through Young Gene. McNulty also regularly received a number of schedules from Young Gene through Laningham, and turned any money collected in excess of that paid to customers over to Young Gene through Laningham. Witnesses also testified to having placed bets with McNulty.
 
 
 22
 Appellant Hanners received bets from a number of customers, and at least on two occasions, personally conveyed this information to Laningham who in turn entered these items in a central set of books he was keeping for Young Gene. Laningham also delivered schedules to Hanners, and received money for Young Gene from Hanners. At trial, evidence seized from Hanners' car was introduced which included, among sports schedules and other items, bookmaking notes containing the names "Mickey," "Gene Smaldone," and "Mike Tomeo."
 
 
 23
 The common ingredient in the gambling operation was Young Gene Smaldone. Young Gene had hired Don Nelson as a phone man through McNulty. Nelson testified that for a period of time he regularly received calls from Hanners, McNulty, Tomeo and others from whom he received bets and disseminated information. The bets from the customers of these individuals were then relayed to Young Gene. During this period of time Young Gene also acted as the distribution source for sports schedules which were delivered or sent to various conductors. Other testimony showing that Young Gene was deeply involved in the running of a gambling operation included his instructions to Laningham to keep the "figures" in a central set of books and his participation along with Frances Smaldone and Mike Tomeo in actually reviewing the total "figures" received from other participants.
 
 
 24
 B. Count II.
 
 
 25
 Count II covers the 1971-72 sporting season and involves a much larger gambling operation than that depicted in count I. Besides the nine individuals appealing their count I convictions, testimony at trial indicates that at least eight other conductors were involved in some aspect of the bookmaking operation. The government attempted to show that Checkers Smaldone was "chairman of the board" while Young Gene and Mike Tomeo assumed positions as principal administrative officers in the business. Collections for the operation were handled by appellants McNulty, Dennis Valley, Lane, Garceo and Mike Valley while appellants Garceo, Villano, Erner and Mike Valley at various times assumed duties as phone men.
 
 
 26
 Six individuals who claimed intimate acquaintance with the operation, among a number of prosecution witnesses, testified for the government including Larry Laningham and Linda Tomeo, the wife of Mike Tomeo. Linda Tomeo was deeply involved in the gambling business during the short period that she lived with her husband. She testified to being in the homes and apartments of a number of the appellants, including the Smaldones, when various phases of the bookmaking operation were being pursued. She described in great detail the types of activities she undertook, and with whom, as well as what she observed others do. Laningham at first continued under the same terms as those he received during the count I period. But, Laningham slowly phased out of doing "figures," then relay, and subsequently devoted his time to working with customers for his 20%-80% split. This meant that he was eventually not as involved with the total span of the operation as in the count I period and the initial stages of the count II period.
 
 
 27
 Testimony of Laningham, Mrs. Tomeo and others was offered to show that Checkers Smaldone took bets and gave out "line" information at his home and, on one occasion, transacted business over a public telephone in a Pueblo, Colorado restaurant. He was usually in the presence of several other conductors including Young Gene. Linda Tomeo further testified that Checkers would often call the Tomeo home seeking information regarding the gambling enterprise. Checkers was generally assisted by Young Gene in the bookmaking transactions and in keeping the "figures." Young Gene also acted as the distributor for the sports schedules used by various conductors. And, on several occasions Young Gene met with individuals indebted to the gambling operation in order to set up repayment schedules.
 
 
 28
 Evidence was offered at trial showing that appellant McNulty lived with the Smaldones between November 1971 and January 1972 at which time he did some collection and phone work for the business. Appellant Lane was also involved in collecting money for the operation. In addition, testimony was given that Lane often disseminated sporting schedules to various conductors and participants in the bookmaking operation. For example, Mrs. Tomeo testified that Lane, Mrs. Lane, Mike Tomeo and herself spent an evening preparing a list of betting customers and sending schedules to these customers. Lane also had a subscription to large quantities of sports schedules but abruptly canceled his subscription when the indictment in this case was returned.
 
 
 29
 Appellants Dennis and Mike Valley were closely connected with the activities of Mike Tomeo. Dennis was often seen with Tomeo and evidence was offered to show that on more than one occasion he helped Tomeo do the "figures." Dennis also helped negotiate a 20%-80% participation arrangement with Dr. Clifford Emily and later assisted Emily with his customers after Emily was hurt in an auto accident. Dr. Emily also worked with Dennis' brother, Mike Valley, who provided Emily with "line" information and on several occasions delivered schedules to Emily's office. Mike Valley was subsequently caught by police at a phone site and his records were seized. The police, acting in Mike Valley's stead, then took 13 phone calls from customers representing approximately $10,350 in wagers. Mike was later released on bond and, according to the testimony of several individuals, again joined his brother Dennis in personally meeting Emily's customers while Emily was convalescing.
 
 
 30
 Evidence was also offered at trial showing that appellants Erner and Garceo acted as phone men for the gambling operation. They leased a telephone in a witness' apartment for a four- to six-week period beginning in the fall of 1971. The phone was to be available while the witness was at work and on Saturdays and Sundays. The witness observed Erner in her apartment two or three times during this period. Also, both Mrs. Tomeo and Laningham testified that they received relay information from Erner. In addition to renting the telephone with Erner, appellant Garceo used a private telephone, installed in the rear of a doctor's office, to receive betting information. Garceo obtained permission to use the phone at which time he explained the bookmaking operation to the doctor, and then proceeded to use the telephone for at least two weeks to give out "line" information and take bets. In October 1971 Garceo was apprehended by the police at a phone site along with incriminating sports schedules and other bookmaking notations.
 
 
 31
 Garceo was replaced at the doctor's office phone site by appellant Villano. Villano worked at the doctor's office for another two weeks giving out and receiving bookmaking information. Laningham also testified to meeting Villano at the doctor's office several times during this period. Villano was arrested upon the execution of a search warrant at the phone site of the doctor's office at which time a number of bookmaking articles were seized. At trial an F.B.I. expert calculated that the minimum wagers found on those items seized in the doctor's office were approximately $12,300.
 
 
 32
 Testimony was also offered at trial as to the average dollar volumes in wagers under the two counts. Laningham, testifying as to the count I period, stated that he handled about $45,000 weekly during the 1970 football season, $25,000 weekly for the 1970-71 basketball season and $25,000 weekly for the 1971 baseball season. Phone man Lockwood testified that he averaged $2,000 to $4,000 each weekday and $15,000 on weekends during the count I period. One customer acknowledged placing $15,000 weekly bets during the 1970 football season. As for the count II period, Laningham further testified that he averaged $12,000-$15,000 in wagers each week. Jeremiah Sullivan stated that from August through November 1971 he handled an increasing monetary volume in wagers until he reached an average of $35,000 per week in November. In addition, the records seized pursuant to three search warrants showed that an average of $10,000-$12,000 in wagers was being placed with particular phone men during the count II period.
 
 II
 THE APPEAL
 
 33
 The ten appellants have raised a number of issues on appeal. The majority of their contentions are applicable to all appellants, but several issues have specific impact on individual appellants. Those issues of general import therefore will be treated initially, leaving the specific concerns until last.
 
 
 34
 A. The Constitutionality of 18 U.S.C. Sec. 1955.
 
 
 35
 Appellants base their challenge to the constitutionality of 18 U.S.C. Sec. 1955 on three grounds: (1) the statute, absent an allegation in the indictment and proof of some interstate commerce nexus, is violative of the tenth amendment; (2) the statute deprives citizens of equal protection of the laws; and (3) it invites double jeopardy. We believe these contentions to be without merit.
 
 
 36
 Today we join five other circuits in upholding 18 U.S.C. Sec. 1955 as a valid and constitutional exercise of congressional power under the Commerce Clause of the United States Constitution. See United States v. Hunter, 7 Cir., 478 F.2d 1019; United States v. Becker, 2 Cir., 461 F.2d 230; United States v. Riehl, 3 Cir., 460 F.2d 454; United States v. Harris, 5 Cir., 460 F.2d 1041; Schneider v. United States, 8 Cir., 459 F.2d 540. Appellants' argument that the statute as written is unconstitutional because it exceeds the power given to Congress to control activities which affect interstate commerce is foreclosed by the Supreme Court's ruling in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686. Perez upheld the constitutionality of a federal statute prohibiting "loan sharking," 18 U.S.C. Sec. 891, et seq., on the basis that activities within a regulated class of activities which do not exceed the reach of federal power under the Commerce Clause need not be shown, in each individual case, to affect interstate commerce. The Court noted that:
 
 
 37
 [L]oan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and rich alike and syphons funds from numerous localities to finance its national operations. 402 U. S. at 157, 91 S.Ct. at 1362.
 
 
 38
 This statement applies with equal force to illegal gambling as prohibited by section 1955. We are bolstered in this belief by numerous investigative reports including the President's Commission on Law Enforcement and Administration of Justice which stated that "gambling is the greatest source of revenue for organized crime." President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 188 (1967). Congress relied heavily on the President's Report when enacting Title VIII of the Organized Crime Act of 1970, Pub.L. 91-452, of which section 1955 is an integral part. The legislative history of the Act is replete with other examples furnished Congress concerning the detrimental impact that illegal gambling has on interstate commerce. 2 U.S.Code Cong. and Admin.News, 1970, pp. 4007-4091. We therefore conclude that Congress acted well within the bounds of the Commerce Clause and requirements laid down in Perez when enacting section 1955.
 
 
 39
 Appellants also urge that section 1955 is unconstitutional because it denies equal protection of the law through its unequal geographical enforcement. As the law now stands gambling activity conducted in one state may be a federal offense, while the same activity in another state may be sanctioned by the law. Yet, we find that section 1955 is not repugnant to the due process clause of the fifth amendment merely because of this variation in state laws. The Supreme Court answered the argument that Congress' exercise of its power over commerce must be uniform when it stated:
 
 
 40
 So far as uniformity is concerned, there is no question that the act uniformly applies to the conditions which call its provisions into play-that its provisions apply to all the States,-so that the question really is a complaint as to the want of uniform existence of things to which the act applies, and not to an absence of uniformity in the act itself. . . . [I]t is obvious that the argument seeks to engraft upon the Constitution a restriction not found in it; that is, that the power to regulate conferred upon Congress obtains subject to the requirement that regulations enacted shall be uniform throughout the United States. James Clark Distilling Co. v. Western Maryland Ry., 242 U.S. 311, 327, 37 S.Ct. 180, 185, 61 L.Ed. 326,339.
 
 
 41
 Section 1955 adheres to the Supreme Court requirements in language and administration because it uniformly applies throughout the United States. See also Schneider v. United States, 8 Cir., 459 F.2d 540; United States v. Sacco, N.D.Cal., 337 F.Supp. 521; United States v. Aquino, E.D.Mich., 336 F.Supp. 737; cf. Turf Center Inc. v. United States, 9 Cir., 325 F.2d 793.
 
 
 42
 Finally, it is suggested that section 1955 is an unconstitutional invitation to double jeopardy because it establishes a separate federal offense by incorporating within its provisions all state statutes which prohibit gambling. Appellants argue that under Sec. 1955 a defendant is, in actuality, being tried twice under the same statute. They contend that Sec. 1955, because of its assimilatory nature, is violative of the requirements laid down in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L. Ed.2d 469. In Ashe it was held that a single sovereign cannot prosecute for separate offenses occurring in a single event where the result of the first prosecution undeniably establishes the innocence of the accused in the second charge. Such is not our case. Here we have the federal government as a separate sovereign prosecuting individuals for violation of federal law. It is well settled in the law that neither conviction nor acquittal in a federal or state court bars a prosecution in a court of another jurisdiction involving or arising from the same transaction or event. Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684; Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729. This rule is dispositive of appellants' double jeopardy claim.
 
 
 43
 B. The Validity of the Colorado Gambling Statutes.
 
 
 44
 Appellants' second major assignment of error is that Colorado Revised Statutes Secs. 40-10-7, 8, and 9 (1963) were repealed on June 30, 1972 and therefore cannot provide the basis for a federal prosecution commencing by indictment on July 14, 1972. The three pertinent Colorado statutes made it a misdemeanor to maintain a gambling parlor, keep a gaming table, or wager upon games.[5]
 
 
 45
 Title 1 U.S.C. Sec. 109 is dispositive of this issue when it states:
 
 
 46
 The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability.
 
 
 47
 As 1 U.S.C. Sec. 109 indicates, whether or not any liability incurred prior to repeal of a statute is to be abated depends upon the applicable repealing act. Colorado Revised Statute 40-1-103 (1972) requires all offenses committed prior to July 1, 1972, the effective date of the New Colorado Criminal Code, to be prosecuted under statutes in effect prior to July 1, 1972.[6] Because the Colorado statute does not obviate prosecutions for illegal activities occurring before July 1, 1972, 1 U.S.C. Sec. 109 operates to nullify any abatement of the indictment and subsequent prosecution in this case. See also Pipefitters Local Union No. 562 et al. v. United States, 407 U.S. 385, 92 S. Ct. 2247, 33 L.Ed.2d 11; United States v. Reisinger, 128 U.S. 398, 9 S.Ct. 99, 32 L.Ed. 480; Faubion v. United States, 10 Cir., 424 F.2d 437.
 
 
 48
 Appellants also contend that Colorado Revised Statute 40-10-8 (1963) is constitutionally infirm and any assimilation of this statute by 18 U.S.C. Sec. 1955 must be grounds for reversal. It is well settled in the law that Congress may adopt as federal laws the laws of a state, and such is not an unconstitutional delegation of congressional authority. United States v. Sharpnack, 355 U.S. 286, 78 S.Ct. 291, 2 L. Ed.2d 282. In this particular instance Congress has assimilated by reference Colorado's gambling statutes (now repealed), only one of which is challenged for vagueness although conviction rested upon all three statutes. We need not deal with this issue on its merits. Conviction in this case stands upon more than one statute, abrogating any necessity of addressing the constitutional challenge. In United States v. Levine, 10 Cir., 457 F.2d 1186, this court refused to explore a constitutional challenge to one statute because the appellants had been convicted under two statutes, one of which was not being questioned. The court in Levine stated that it "should not decide abstract, hypothetical or contingent questions or any constitutional question in advance of the necessity of its decision." Levine, supra at 1189. Such necessity does not exist in this case. See Dickenson v. Davis, 10 Cir., 245 F.2d 317.
 
 
 49
 C. The Denial of Severance and a Change of Venue.
 
 
 50
 Appellants Checkers, Young Gene, McNulty, Hanners, Lane, Dennis Valley, Erner and Garceo all petitioned the district court to be severed or granted a separate trial which was denied. They now complain that failure to sever prejudiced the trial result because the jury was unable to afford each appellant an independent determination of his guilt or innocence. We do not agree. It has been affirmed by this court many times that Fed.R.Crim.P. rule 14 leaves the question of severance to the sound discretion of the trial judge. United States v. Cooper, 10 Cir., 464 F.2d 648; United States v. Jorgenson, 10 Cir., 451 F.2d 516, cert. den., 405 U.S. 922, 92 S. Ct. 959, 30 L.Ed.2d 793; United States v. Fairchild, 10 Cir., 435 F.2d 972. Furthermore, a severance may be granted only where a defendant has shown that he would be clearly prejudiced by a joint trial. Lowther v. United States, 10 Cir., 455 F.2d 657. The record on appeal shows that the district court would consistently caution the jury when proffered evidence was admissible only against certain defendants. Also, during the course of the trial the court strictly limited the admissibility of evidence to specific defendants against whom the evidence was tendered. The record further shows an absence of inconsistent defenses which mitigates against the need for severance. United States v. Mallory, 10 Cir., 460 F.2d 243; United States v. Troutman, 10 Cir., 458 F.2d 217. Accordingly we find no abuse of discretion by the trial court in its denial of the motions to sever.
 
 
 51
 Appellants also assert that trial error was committed when the district court refused to grant a change of venue. Checkers and Young Gene claim that the name Smaldone is so closely associated with crime and violence in the Colorado area that any possibility of a fair trial was nonexistent. The other appellants allege that a change of venue was necessary in order that they might escape the phenomenon of guilt by association. As with the question of severance, we are bound to give great deference to the discretion of the trial court, absent clear abuse, when reviewing motions for a change in venue. Fed.R. Crim.P. rule 21; Dennis v. United States, 10 Cir., 302 F.2d 5; Wheeler v. United States, 10 Cir., 382 F.2d 998. The record reveals an exhaustive voir dire examination by the court of prospective jurors concerning possible prejudice. And there was nothing which occurred during actual selection of the jurors to indicate that they would render anything other than a fair and impartial verdict. Therefore, the totality of facts contained in this record does not warrant reversal.
 
 
 52
 D. The Selection of a Jury.
 
 
 53
 Ninety-seven prospective jurors were summoned by the trial court, twenty-two of whom were immediately dismissed upon indicating that they had read or heard of some of the defendants. The jury panel was then drawn from a venire of individuals who manifested no prior knowledge of the defendants or their activities. Appellants now assert, in direct contradiction to their jury prejudice claim, that a full and fair hearing was unavailable from the jury because the empaneling process eliminated a class of people-"those with the intellectual capability and curiosity to read the newspapers." This assertion is spurious. The trial court was consistent in its attempts to protect the appellants from reaping the consequences of possible prejudice. To that end the court conducted a searching and thorough voir dire examination, excluding any prospective jurors whose knowledge or circumstances might possibly bias their deliberations. But to say that an identifiable class, i. e., the "intellectually capable," was systematically excluded from jury duty requires substantiation which is not reflected in the record, nor does logic dictate its conceivability.
 
 
 54
 Appellant Dennis Valley asserts further trial error by claiming that he was denied an opportunity to inspect the master and qualified jury wheels, and to have certain voir dire questions asked of potential jurors. The Jury Selection and Service Act of 1968, 28 U.S.C. Sec. 1861 et seq. is intended to insure that a fair cross section of the community is represented on federal juries. Among other procedures, it provides a method for challenging the selection of a grand or petit jury. Section 1867(d) states in pertinent part:
 
 
 55
 Upon motion filed . . . containing a sworn statement of facts which if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commission or clerk, and any other relevant evidence. . . . If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.
 
 
 56
 Appellant Valley in accordance with the Act filed a motion to quash the array and dismiss the petit jury panel. Appellant alleged that certain identifiable groups of citizens were excluded from the jury pool in violation of constitutional requirements but offered nothing more than conjecture to substantiate this claim. Notwithstanding, appellant urges that section 1867(d) requires that he be allowed to inspect all records including the master and qualified jury wheels in order to prove selection infirmities. Contrary to appellant's position, we believe the trial court fully complied with the letter and spirit of the Jury Selection Act in protecting appellant's right to a fair and impartial trial by his peers.
 
 
 57
 The record shows that, upon appellant's motion, the court carefully explained to counsel the jury selection procedure used by the United States District Court for Colorado, which was adopted to comply with the 1968 Act. Counsel had also previously been provided a copy of the jury selection plan. The court permitted examination of all pertinent records and documents although there is no evidence in the record to indicate that counsel availed himself of the opportunity to examine such documents. Additionally, the acting jury commissioner of the city and county of Denver was present in court during argument of the motion but appellant elected not to call the commissioner as a witness. Thus, the record indicates a failure by appellant to meet even the initial burden of establishing a prima facie showing that the jury selection plan used in this case is constitutionally invalid or that it is not in compliance with the provisions of the Jury Selection and Service Act of 1968. See United States v. Tijerina, 10 Cir., 446 F.2d 675; United States v. James, 9 Cir., 453 F.2d 27.
 
 
 58
 Appellant Dennis Valley prior to trial also submitted a list of proposed voir dire questions to be asked of prospective jurors. The thrust of these questions was to ascertain whether any jurors had placed bets upon sporting events or bingo games, and whether they understood the actual charges in the case.[7] Again, we are asked to review a matter which rests within the discretion of the trial court, especially if the voir dire examination is conducted by the court itself pursuant to Fed.R.Crim.P. rule 24(a). Of course, counsel was free to submit proposed voir dire questions, but the court was at liberty to pursue its examination in any manner subject to the essential demands of fairness. Lowther v. United States, 10 Cir., 455 F.2d 657; United States v. Brewer, 10 Cir., 427 F.2d 409; United States v. Williams, 10 Cir., 417 F.2d 630. A review of the record convinces us that there was no abuse of discretion by the trial court in not asking the proffered voir dire questions.
 
 
 59
 E. The Jury Instructions.
 
 
 60
 Appellants press upon this court the contention that several of the instructions to the jury were so misleading that they constitute plain error. Each instruction will be separately discussed, though upon careful review of the instructions, taken as a whole, we find no basis for reversal.
 
 
 61
 1. The Reasonable Doubt Instruction.
 
 
 62
 The trial court gave the following reasonable doubt instruction:
 
 
 63
 A reasonable doubt is a doubt based upon reason and common sense. It is rarely possible to prove anything to an absolute certainty. Proof beyond a reasonable doubt is established if the evidence is such that you would be willing to rely and act upon it in the more important of your own personal affairs. . . .
 
 
 64
 A reasonable doubt exists, ladies and gentlemen, when after a careful and impartial consideration of all of the evidence in the case the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.
 
 
 65
 Appellants take exception to the "more important of your personal affairs" standard enunciated by the court, claiming that such is no more than a preponderance test.
 
 
 66
 It must be noted that courts have been engaged in a continual struggle to develop formulations which adequately convey to the jury the meaning of "reasonable doubt." The Supreme Court, for example, when faced with a challenge to an instruction similar to that in the instant case stated that the better charge would have been in terms of "the kind of doubt that would make a person hesitate to act." Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150, 167. Yet, that Court found no reversible error because "the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some." Id. We conclude that the same rationale applies to this case, especially in light of the additional "moral certainty" instruction enunciated by the trial court and the applicable review standard which allows us to view any single instruction as part of a totality. United States v. Fletcher, 10 Cir., 444 F.2d 619; Devine v. United States, 10 Cir., 403 F. 2d 93; Adams v. United States, 10 Cir., 375 F.2d 635; Lewis v. United States, 10 Cir., 365 F.2d 672.
 
 
 67
 2. The "Risk" Instruction.
 
 
 68
 Appellants contend that the government must prove that each conductor possessed specific intent to violate Sec. 1955. They therefore object to a "running the risk" instruction claiming that, at best, it was confusing to the jury while in all likelihood the consequence of the instruction in the jurors' minds became no more than the declaration of a conspiracy charge.[8]
 
 
 69
 After careful consideration of the statute and its history we conclude that Sec. 1955 is not a specific intent statute, thus relegating any possible prejudicial effect on appellants' case from the "risk" instruction to the arena of harmless error.[9] The gambling activities for which appellants were convicted find their origin in Colorado law. The additional elements necessary for conviction under Sec. 1955 are standards essential to warrant federal intervention. United States v. Ceraso, 3 Cir., 467 F.2d 653. As such, it was not necessary for appellants to be aware of all of the federal ingredients enunciated in Sec. 1955 before a conviction could be obtained.[10] See generally United States v. Gardner, 9 Cir., 454 F.2d 534. Therefore, appellants in a very real sense took a risk when violating state gambling enactments that they might also come within full reach of federal criminal sanctions.
 
 
 70
 3. The Aiding and Abetting Instruction.
 
 
 71
 Appellants next assign as error the trial court's aiding and abetting instruction claiming that it only further confused the jury into including those accused of aiding and abetting as part of the five conductors necessary for a conviction under Sec. 1955.[11] Again, appellants can find little comfort in this contention. Under count I four admitted conductors took the stand while under count II six conductors testified evidencing that little, if any, confusion by the jury could have occurred. Furthermore, the trial court was most circumspect in formulating its instructions and explaining them to the jury, which likewise attenuated any possible prejudice. Moreover, appellate courts should be slow to impute to juries the inability to correctly understand the totality of jury instructions, even in a case as complicated as the present. Cf. Fairmount Glass Works v. Cub Fork Coal Co. et al., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439; Roth v. United States, 10 Cir., 339 F.2d 863.
 
 
 72
 Other assignments of error in the trial court's instructions to the jury are without merit.
 
 
 73
 F. The Dennis Valley Contentions.
 
 
 74
 Appellant Dennis Valley puts forth additional contentions of trial error not asserted by other appellants: (1) that the trial court erred in allowing testimony as to events after the close of the indictment period, and (2) that a mistrial should have been declared when it was discovered that an outline of each witness' testimony was left in the witness room.
 
 
 75
 As to the first assignment of error, appellant argues that his case was prejudiced when three witnesses were allowed to testify to gambling contacts with Valley after the end of the indictment period charged in the second count. The record reveals limited references to certain events, but the specifics of these encounters were not allowed into evidence. The record also discloses that this testimony was introduced to show that the gambling operation was part of a continuous enterprise. Accordingly, the evidence was properly admitted for the limited purpose of establishing a course of conduct and a common gambling scheme. United States v. Pauldino, 10 Cir., 443 F.2d 1108; Collins v. United States, 10 Cir., 383 F.2d 296.
 
 
 76
 Appellant Valley also claims that a mistrial should have been declared when on the fifth day of trial a government attorney inadvertently left a "trial manual" in the witness room. The trial manual contained the names of government witnesses and a brief summary of the possible testimonies of certain of these witnesses. One of the witnesses testified to having seen the manual. The trial court thoroughly examined this witness, after which a determination was made that the presence of the manual was not prejudicial. This question was properly addressed to the sound discretion of the trial court and upon review we find no abuse of that discretion or manifest injustice. See generally United States v. Stidham, 10 Cir., 459 F.2d 297; Johnston v. United States, 10 Cir., 260 F.2d 345; Mitchell v. United States, 10 Cir., 126 F.2d 550.
 
 
 77
 G. The Garceo Arrest.
 
 
 78
 The district court denied pretrial motions to suppress the arrest and subsequent incriminating statements of appellant Frank Joseph Garceo based upon the following evidence: Early in October 1971 a warrant had been obtained by members of the Organized Crime Unit of the Denver Police Department to search a residence located at 3556 Tejon in Denver. The warrant was executed by four investigators including Officer Donald Mulnix, who was the only government witness to testify as to these occurrences at the pretrial hearing and at trial. After knocking on the door and announcing themselves as police officers, they broke a window and gained entry into the duplex. The search disclosed one Neil Sutton who was placed under arrest after he was discovered hiding in the kitchen. The officers also found near the telephone a number of sheets of paper upon which gambling wagers were apparently recorded as well as a weekly sports journal with betting information written in the margins.
 
 
 79
 Approximately five minutes after the police entered the residence, appellant Garceo came to the door and inquired as to what was transpiring. He was brought into the residence and immediately placed under arrest. After being made aware of his rights, the appellant signed an advisement of rights form and a short time later dictated an incriminating statement concerning illegal gambling activities undertaken at the Tejon street residence. It is this arrest and subsequent statement that appellant now challenges.
 
 
 80
 We believe that the search warrant in this case met the standards prescribed in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. The warrant was issued based upon information received from a reliable informant and an independent investigation undertaken by the affiant. But, even given the legality of the search in this case, the fourth amendment still commands that probable cause must have existed at the moment of appellant's arrest. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L. Ed.2d 142. To establish probable cause for arrest it was necessary for the government to demonstrate that the arresting police officer had facts and other reasonably trustworthy information within his knowledge which would be such as to warrant a prudent man into believing that the appellant had committed, or was committing, an offense. United States v. Richerson, 10 Cir., 461 F.2d 935; Holbrook v. United States, 10 Cir., 406 F.2d 44. Appellant Garceo's arrest failed to meet that standard.
 
 
 81
 Garceo was arrested after appearing at the door of a residence, which was not his own, and inquiring "what the hell is going on." The only other factual predicates surrounding the arrest were the gambling paraphernalia found in the residence and the statement by Officer Mulnix that Garceo was a known gambler who was often seen in the area. Certainly the totality of these facts falls short of that necessary level of probable cause required for an arrest, especially when the allegation that Garceo was a known gambler "is but a bald and unilluminating assertion of suspicion that is entitled to no weight . . .." Spinelli, supra at 414 of 393 U.S., at 588 of 89 S.Ct.
 
 
 82
 The record does support the trial court's finding that the Miranda warnings were properly given after appellant's arrest and that his subsequent inculpatory statement was voluntarily and knowingly made. Furthermore there does not appear in this case to be any exploitation of an illegal arrest or detention. Accordingly the statement in question was admissible even though the appellant was illegally in police custody. United States v. Lepinski, 10 Cir., 460 F.2d 234; United States v. Davis, 10 Cir., 456 F.2d 1192; Mapys v. United States, 10 Cir., 409 F.2d 964.H. The Sufficiency of the Evidence.
 
 
 83
 The final issue to which we address ourselves is the sufficiency of the evidence upon which the appellants were convicted. The standard of evidentiary review is well settled in this circuit: "The evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-is sufficient if, when taken in the light most favorable to the government, the fact finder may find the defendant guilty beyond a reasonable doubt." United States v. Ortiz, 10 Cir., 445 F.2d 1100, 1103. Furthermore, evaluating the credibility of witnesses when there is a conflict in testimony, as in this case, is for the jury and not an appellate court. United States v. Sierra, 10 Cir., 452 F. 2d 291; United States v. Weiss, 10 Cir., 431 F.2d 1402. Our review of the record on both counts of the indictment as it applies to each appellant convinces us that ample evidence existed from which a jury could render guilty verdicts.
 
 
 84
 In order for the government to prove that 18 U.S.C. Sec. 1955 was violated, it was not only necessary to show that there was a gambling operation in violation of state law, but that it was conducted, financed, managed, supervised, directed, or owned by at least five people and that it operated substantially continuously for at least thirty days or had more than $2000 gross revenue in any single day. It was not essential, contrary to appellants' assertions, to establish that each conductor was involved in the gambling business for more than thirty days or generated at least $2000 gross revenue in a single day. These requirements refer to the gambling operation and not to individuals. United States v. Dimario, 6 Cir., 473 F.2d 1046; United States v. Ceraso, 3 Cir., 467 F.2d 653. And the five individual participants necessary to sustain a federal conviction need not carry on or cause the entire gambling operation to function. Congress' intent was to incorporate within the statute's prohibition all participants, except those who actually wagered, no matter their roles including "high level bosses and street level employees." 2 U.S.Code Cong. and Admin. News 1970, pp. 4029-4030; United States v. Becker, 2 Cir., 461 F.2d 230; United States v. Riehl, 3 Cir., 460 F.2d 454. It is against these criteria that the sufficiency of the evidence in this case must be weighed.
 
 
 85
 The factual predicates upon which the convictions were based have been extensively discussed throughout the opinion rendering a comprehensive recitation of the evidence unnecessary. Suffice it to note that the record is replete with evidence showing that a well-organized and widespread gambling operation was being conducted for several years in the Denver area. The direct and circumstantial evidence is sufficient to confirm a link between each appellant and at least four other conductors involved in the gambling business. And, all other elements necessary for a conviction under Colorado law and 18 U.S.C. Sec. 1955 are confirmed on the record.
 
 
 86
 Each and every other contention of trial error has been considered and found without merit.
 
 
 87
 The convictions of Eugene Louis Smaldone, Guy McNulty and Melvin Daniel Hanners on count I are affirmed.
 
 
 88
 The convictions of Eugene Louis Smaldone, Eugene Smaldone, Leo Edward Lane, Dennis Michael Valley, Michael J. Valley, Josef Richard Erner, and Harry Anthony Villano on count II are affirmed.
 
 
 89
 The October 2, 1971 arrest of Frank Joseph Garceo, as already discussed, was illegal. But, the circumstances leading to a subsequent inculpatory statement indicate that it was voluntarily made and therefore admissible despite its suspect nature. This statement considered with other proffered testimony as to Garceo's activities leads us to conclude that sufficient evidence existed to sustain the jury's verdict. The conviction of Garceo is affirmed.
 
 
 
 *
 Of the United States Court of Claims, sitting by designation
 
 
 [1]
 The original indictment named fifteen defendants, but defendants Frances Smaldone, Michael Tomeo and Clifford Emily were severed before the trial commenced. After severance there were six defendants named under count I and ten defendants under count II. Two of the six defendants, Checkers Smaldone and Dennis Valley, named in count I, were acquitted at the close of the government's case, and the jury found defendant Harvey Williams not guilty under count II
 
 
 [2]
 Appellants Young Gene and McNulty were found guilty under both counts of the indictment. Count III of the indictment alleged illegal use of the mail by appellant Lane in violation of 18 U.S.C. Sec. 1302. A judgment of acquittal was entered at the close of the government's case
 
 
 [3]
 The word "conducts" as used in this opinion will follow the definition provided by the authors of 18 U.S.C. Sec. 1955:
 The term "conducts" refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet. 2 U.S.Code Cong. and Admin.News, 1970, p. 4029.
 
 
 [4]
 Sophisticated electronic devices such as telephone switches and radio telephones were used at times throughout the operation to further prevent detection and protect any of the participants from being caught
 
 
 [5]
 The three applicable Colorado statutes state:
 40-10-7. Gambling rooms-penalties.-If any person shall keep any room, building, arbor, booth, shed or tenement of any description, to be used or occupied for gambling, or shall knowingly permit the same to be used or occupied for gambling; or if any person being the owner of any room, building, arbor, booth, shed or tenement, of any description, shall rent the same to be used or occupied for gambling, the person so offending shall, on conviction thereof, be fined in any sum not less than thirty dollars nor more than five hundred dollars, or be imprisoned in the county jail not less than ten days nor more than thirty days, or both at the discretion of the court. If the owner of any room, building, arbor, booth, shed or tenement of any description shall know that any gambling tables, apparatus or establishment is kept or used in such room, building, arbor, booth, shed, or tenement for gambling and winning, betting or gaining money or other property, and shall not forthwith cause complaint to be made against the person so keeping or using such room, building, arbor, booth, shed or tenement, he shall be taken, held and considered to have knowingly permitted the same to be used and occupied for gambling. Every day for which any person shall keep any house, room, building, tent or tenement of any description, to be used or occupied for gambling, and shall knowingly allow any such place to be used or occupied for gambling, shall be deemed and held to be a separate and distinct offense. [emphasis added.]
 40-10-8. Keeping gaming table-gambling for livelihood-penalty.-If any person shall keep or exhibit any gaming table, establishment, device or apparatus to win or gain money or other property, or shall aid, assist or permit others to do the same, or if any person shall engage in gambling for a livelihood, or shall be without any fixed residence, and in the habit and practice of gambling, he shall be deemed and taken to be a common gambler, and upon conviction thereof shall be imprisoned in the county jail not less than three months nor more than one year, and be fined in any sum not less than two hundred dollars nor more than five hundred dollars. [emphasis added.]
 40-10-9. Wagering upon games-penalty.-If any person shall play at any game whatsoever, for any sum of money or other property of value, or shall make any bet or wager for any sum of money or other property of value, upon the result of such game, every such person, on conviction thereof, shall be fined in any sum not less than fifty dollars nor more than one hundred and fifty dollars. [emphasis added.]
 The instructions to the jury by the district court included only those alternative means of violations which are underlined in the statutes above.
 
 
 [7]
 The counsel for appellant Dennis Valley submitted thirty-eight proposed questions to the court but only objects to the court's refusal to ask the following three questions:
 
 
 [15]
 Have you ever heard of people placing bets on baseball, football, or basketball games? If so do you think this is an immoral activity? Have you yourself ever made a bet on the outcome of a game? Have you ever participated in organized Bingo games for money stakes?
 
 
 [17]
 What do you think of people who gamble?
 
 
 [38]
 Do you understand that merely being in the business of gambling also is not the charge against the defendants? The charge is conducting, financing, managing, supervising, directing or owning a gambling business which was illegal under the law of the State of Colorado and was in operation for thirty or more days or had a gross revenue of $2,000 on any given day, and involved five or more persons in a supervisory capacity
 
 
 [8]
 The court gave the following instruction: Each defendant is to be considered separately, but the essence of the law is that the United States must prove beyond a reasonable doubt that the individual defendant that you are considering was involved in the illegal business with four or more other persons, some of whom may or may not have been named as defendants
 If you find that any person named as a defendant in these counts was engaged in the conduct of an illegal gambling business at least in part, it does not matter under the law that he may not have known all the participants in the particular gambling business or known that it was a business which was being conducted by five or more persons. If that person named as a defendant conducted a part of the gambling business, he ran the risk that it may involve five or more persons and the further risk that the business had been or remained in continuous operation for a period in excess of 30 days or that it might have a gross revenue in excess of $2,000 in any single day.
 Appellants also strenuously argue that the "risk" instruction was, in fact, a conspiracy charge and that conspiracy cannot be charged under Sec. 1955. Although we make no determination as to whether Sec. 1955 can be the basis of a conspiracy charge it should be noted that three circuit courts have sustained conspiracy convictions under Sec. 1955: United States v. Iannelli, 3 Cir., 477 F.2d 999; United States v. Thaggard, 5 Cir., 477 F.2d 626; United States v. Fiorella, 2 Cir., 468 F.2d 688. Only one circuit thus far has reversed a conviction on a conspiracy count under Sec. 1955: United States v. Hunter, 7 Cir., 478 F.2d 1019.
 
 
 [9]
 At trial the court also gave the standard "specific intent" and "knowingly" instructions. Given our present holding the appellants received, if anything, more favorable jury instructions than those to which they were entitled
 
 
 [10]
 Our conclusion is further bolstered by reference to 18 U.S.C. Sec. 1952 where substantive elements of the offense, e. g. "racketeering" are defined by state law, but a nexus to interstate commerce must also be established before a federal crime is committed. Four circuits have held that for a conviction under 18 U.S.C. Sec. 1952 a defendant need not be aware of the federal jurisdictional elements. United States v. Roselli, 9 Cir., 432 F.2d 879; United States v. Hanon et al., 8 Cir., 428 F.2d 101; United States v. McMenama, 6 Cir., 403 F.2d 969; United States v. Miller et al., 7 Cir., 379 F.2d 483, cert. den., 389 U.S. 930, 88 S.Ct. 291, 19 L. Ed.2d 281
 
 
 [11]
 Pursuant to 18 U.S.C. Sec. 2 the district court gave the following instruction:
 Each Count of the Indictment also charges a violation of Title 18, United States Code, Section 2.
 In a case where two or more persons are charged with the commission of a crime, the guilt of an accused may be established without proof that all the defendants did every act constituting the offense.
 This statute which I have alluded to, Section 2 of Title 18, provides in substantial part as follows:
 "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."