UNITED STATES of America,

v.

COMPUTER SCIENCES CORPORA-
TION, et al., Defendants.

Crim. No. 80–158–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

March 5, 1981.

William Lynch, Senior Counsel for Litigation, Dept. of Justice, Washington, D. C., for United States.

Milton Eisenberg, Washington, D. C., Michael McGettigan, Alexandria, Va., Nathan Lewin, R. Stan Mortenson, Washington, D. C., Thomas B. Carr, Arlington, Va., Barry W. Levine, David R. Addis, Barnet D. Skolnik, Washington, D. C., Andrew P. Miller, Alexandria, Va., Thomas L. Patten, Allen B. Green, Washington, D. C., Stephen M. Colangelo, Alexandria, Va., Walter J. Bonner, Jacob A. Stein, Robert Muse, Washington, D. C., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This criminal action against a major domestic corporation and six individual defendants is before the court on the following pretrial motions:

| DATE FILED | MOTION |
| --- | --- |
| November 25, 1980 | All Defendants' Motion to Dismiss the Indictment on Grounds That RICO, Mail Fraud and Wire Fraud Allegations as Well as Allegations Regarding the Contract are Improper |
| November 25, 1980 | Blecker's and Loux's Motion to Dismiss the Indictment on Grounds of Collateral Estoppel |
| November 25, 1980 | Blecker's and Loux's Motion to Dismiss the Indictment as Against the Defendants for Prosecutorial Vindictiveness |
| November 25, 1980 | All Defendants' Motion to Dismiss the Indictment on the Grounds That the Grand Jury was Not Fully Informed |
| November 25, 1980 | All Defendants' Motion to Dismiss the Indictment on the Grounds That the Grand Jury was Not Properly Selected |
| January 28, 1981 | All Defendants' Motion to Dismiss the Indictment on the Grounds That Unauthorized Persons Invaded the Secrecy of the Grand Jury Proceedings |
| February 26, 1981 | All Defendants' Motion for Disclosure of Grand Jury Testimony |

These motions were accompanied by voluminous briefs, affidavits and supporting documents. The government responded with voluminous briefs and affidavits. The court set certain of the motions for argument on January 6th and 7th, 1981. Arguments on the remaining motions were set for January 14th and 16th, 1981. As a result of the latter hearings, the court ordered an evidentiary hearing on February 10th and 11th, 1981. This Memorandum Opinion addresses each of these motions.

The 27-page indictment in this prosecution was returned by the grand jury on October 8, 1980. It contains 57 counts against defendants Computer Sciences Corporation ("CSC") and against CSC employees John W. Luke, Norman W. Derrick, Thomas A. Marti, Peter Loux; a former CSC employee, Erwin L. Allen; and against the president of Icarus Corporation, Herbert G. Blecker.

In the first three counts, the indictment charges violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). Count 1 charges a § 1962(d) RICO conspiracy against all of the defendants. Count 2 charges a violation of § 1962(d) against all defendants; that is, conducting an enterprise through a pattern of racketeering activity. Count 3 charges a violation of § 1962(a), investing and using income derived from a pattern of racketeering activity in an enterprise, against CSC only.

Counts 4 through 27 charge various acts of mail fraud against defendants CSC, Luke, Allen, Marti and Derrick. Counts 28 through 37 charge wire fraud against defendants CSC, Luke, Allen, Marti and Derrick. Counts 38 through 43 charge mail fraud against defendants CSC, Luke, Allen, Loux and Blecker. The conduct charged in Counts 4 through 43 is incorporated in the first three counts as a part of the pattern of racketeering engaged in by the defendants.

Counts 44 through 55 charge defendants CSC, Luke, Allen, Marti and in most instances Derrick with presenting false claims to the United States Government. Counts 56 and 57 charge False Claims Act violations against defendants CSC, Luke, Allen, Loux and Blecker.

The allegations in these charges concern the acquisition of the National Teleprocessing System ("NTS") contract by CSC and billing for computer services rendered under the contract by the Infonet Division of CSC. Regarding the acquisition of the contract, it is alleged that Luke bribed a GSA contracting officer in order to obtain the NTS contract. In addition, it is charged that the defendants overbilled the government for Systems Resource Units ("SRU's") and for computer software packages.

The motions listed above challenge the indictment on a number of grounds. First, the defendants allege that Counts 1 through 43 must be dismissed because the

facts alleged do not sustain a charge under RICO or under the mail and wire fraud statutes. They allege that Counts 1 through 3 must be dismissed for failure to state a claim under RICO and because each RICO count is improperly based upon a time-barred bribery allegation. In addition, they allege that the first three counts of the indictment must be dismissed because RICO cannot constitutionally be applied to the facts here alleged. Further, defendants allege that Counts 2, 3 and 4 through 43 should be dismissed for multiplicity. Defendants also allege that Counts 1 through 3 are defective as they do not apprise the defendants of the extent of property subject to forfeiture under RICO.

The defendants also allege that the indictment should be dismissed in its entirety under the recent Fourth Circuit decision in *United States v. Race, et al.*, 632 F.2d 1114 (4th Cir., 1980), the conduct alleged in the indictment as fraudulent is authorized by a reasonable interpretation of the contract.

In addition, the defendants move to dismiss on grounds that the grand jury was not fully informed due to the technical nature of the indictment and that the grand jury was selected in violation of the United States Constitution and laws.

Defendants Loux and Blecker move to dismiss on grounds that the issue of whether there was a conspiracy against the government by them was resolved in an earlier proceeding and collateral estoppel bars the assertion here. In addition, defendants Loux and Blecker move to dismiss on grounds of prosecutorial vindictiveness.

All of the defendants move to dismiss on grounds of prosecutorial misconduct and on grounds that the secrecy of the grand jury was invaded by unauthorized persons.

## I.

### RICO COUNTS

A. *Counts 1–3*

The defendants are charged in Counts 1 through 3 with violating several of the provisions of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). Count 1 charges all defendants with a conspiracy to conduct the affairs of CSC's unincorporated "Infonet" Division "through a pattern of racketeering activity" in violation of 18 U.S.C. § 1962(d). Count 2 charges the defendants with actually conducting the affairs of the Infonet Division "through a pattern of racketeering activity" by bribery, mail fraud and wire fraud, in violation of § 1962(c) and § 2. That count also claims a violation of § 1963, although that section is a recitation of criminal penalties for violation of § 1962. Count 3 alleges that CSC received income from the alleged pattern of racketeering activities and invested that income in the operation of the Infonet Division, making that investment subject to forfeiture to the United States pursuant to § 1963(a).

The conspiracy alleged in Count 1 was to violate 18 U.S.C. § 1962(c), which provides that

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

In order to understand exactly what it is that § 1962(c) makes unlawful it is necessary to set forth several of the definitions provided in § 1961. The most important and detailed is the definition of "racketeering activity." Section 1961(1) defines it as

(A) Any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) Any act which is indictable under any of the following provisions of Title 18, United States Code:

The sections listed are ones relating to, *inter alia*, bribery, mail fraud and wire fraud.

A "person" is defined as "any individual or entity capable of holding a legal or bene-

ficial interest in property." Section 1961(3). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Section 1961(4).

A "pattern of racketeering activity" is defined as:

At least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

§ 1961(5).

Count 1 alleges that the defendants CSC and Luke bribed a GSA contracting officer by employing him after making sure CSC was awarded the NTS contract. The alleged bribery occurred in 1971 or 1972, and, standing alone, would be barred by the statute of limitations.[1] 18 U.S.C. § 3282. It is the government's contention, however, that despite this bar the bribery can be used to meet the definition of § 1961(5) for a "pattern of racketeering activity."

Count 1 also alleges that CSC and co-defendants Luke, Allen, Marti and Derrick conspired to commit mail fraud against the government by purposely overbilling the government under the contract through a scheme designed to confuse the government as to how much would be charged for each "system resource unit"—the measure used to charge for computer use. The indictment also alleges that these defendants altered the method of calculating these system resource units to increase the charges to the government, and that they fraudulently increased the cost of the software package sold under the contract. The mail fraud theory was that by these means the defendants conspired to cause the government to send checks through the mails to pay for computer use under the contract. Wire fraud conspiracy was alleged under the theory that the computer signals were transmitted over interstate wires, and that these signals were to be the basis for the overbillings.

CSC, Luke, Allen, Loux and Blecker were alleged to have also conspired to increase fraudulently the cost of the software by fifty percent by falsely claiming that a new package was an improvement over the old one. The indictment alleged that this was a conspiracy to commit mail fraud because the invoices and checks were sent through the mails, and to commit wire fraud on the theory again that the overbillings were to be based on computer signals sent over interstate wires.

Count 2 charges the substantive offenses on which the Count 1 conspiracy was based and Count 3 sets forth the investment into Infonet and the forfeiture allegation.

### B. *The Enterprise*

One of the things which separates a RICO charge from the predicate acts which underlie the charge is the conducting of an "enterprise" through a pattern of racketeering activities. By charging CSC with the RICO counts the indictment alleges that CSC conspired with the co-defendants and did operate its own Infonet Division through a pattern of racketeering.

As has been often written,[2] one of the main goals of RICO was to counter organized criminal elements in their attempt to infiltrate legitimate businesses.[3] In passing the Act, Congress found that organized crime in this country

---

1. The indictment was returned by the grand jury on October 8, 1980.

2. *See, e. g.*, 116 Cong.Rec. 18939 (1970) (remarks of Sen. McClellan); Pub.L. 91-452, § 1, 84 Stat. 922, *reprinted in* [1970] U.S.Code Cong. & Ad.News 1073; *United States v. Whitehead*, 618 F.2d 523, 525 n. 1 (4th Cir. 1980); Note, 65 Va.L.Rev. 109, 109 (1979).

3. This court does not claim that for RICO to be invoked outside forces must infiltrate an otherwise unadulterated business activity. The Fourth Circuit has written that RICO "is not so limited, and that its prohibitions apply to the use of racketeering activities to promote any enterprise affecting interstate commerce." *United States v. Whitehead*, 618 F.2d 523, 525, n. 1 (4th Cir. 1980). *See also United States v. Mandel*, 591 F.2d 1347, 1375 (4th Cir. 1979).

Is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption . . . . [and that illegally obtained funds] are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes . . . .

Pub.L. 91–452, § 1, U.S.Code Cong. & Admin.News 1970, 1073.

To fight against this evil, RICO provides for stiff penalties upon conviction[4] and for forfeiture of any interest acquired in an enterprise from a pattern of racketeering activity.[5]

With both the congressional purpose and the definition of "enterprise" in mind, this court must determine whether the Infonet Division is an enterprise for purposes of RICO—for without an "enterprise" there can be no RICO violations.

It is the opinion of this court that the Infonet Division cannot be an enterprise as far as CSC is concerned. Infonet has no legal existence separate and apart from CSC, being only one of several of CSC's unincorporated divisions. Although Infonet had its own officers (for example, defendant Luke was its president) it served only an organizational purpose in practice.

■ An unincorporated "division of a corporation is not a separate entity, but is the corporation itself." *In Re Sugar Industry Antitrust Litigation*, 579 F.2d 13 (3rd Cir. 1978). *See also, Western Beef, Inc. v. Compton Investment Co.*, 611 F.2d 587 (5th Cir. 1980). It is clear, then, that the Infonet Division is not "an individual, partnership, corporation, association, or other legal entity." At *most*, the division is "a group of individuals associated in fact although not a legal entity." However, even if it is such a group of individuals associated in

fact, CSC, by definition, could not be included in this association. Section 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." It is clear from this definition that "individual" is used differently from "person" in the act to connote a living person.

■ Therefore, because Infonet cannot supply the enterprise element—at least as far as CSC is concerned—Counts 1, 2, and 3 must be dismissed as to CSC. No authority has been found on the question of whether the rejection of the enterprise element for one co-defendant requires the rejection of the alleged enterprise for the other defendants. This court, however, believes logic dictates that in order to meet his burden of proof, the prosecutor must show that co-defendants charged under RICO were operating the same enterprise through a pattern of racketeering activity. Allowing the definition of the enterprise to shift for each co-defendant would make the enterprise element more of an intellectual exercise for ingenious prosecutors than a critical element in the offense—an element essential to carrying out Congress's purpose. Therefore, it is this court's opinion that for this reason the RICO counts must be dismissed, although, as the discussion below demonstrates, this is by no means the sole reason for dismissal of these counts.

C. *Through A Pattern of Racketeering Activity*

■ Even assuming that Infonet could constitute an enterprise—either as an entity or as a group of individuals associated in fact—it is still essential that the enterprise be conducted "through a pattern of racketeering activity." This means the enterprise must have "its affairs advanced or benefitted in some fashion, direct or indirect. . . ." *United States v. Webster, et al.*, 639 F.2d 174, 4th Cir. 1981. If the enterprise alleged

---

**4.** 18 U.S.C. § 1963(a) provides that for violating § 1962 a person can be fined up to $25,000 and imprisoned for up to 20 years or both and shall forfeit to the government any interest acquired or maintained in violation of § 1962 and any interest in, security of, claim against or proper-

ty or contractual right providing a source of influence over the enterprise which the person has established in violation of § 1962.

**5.** See footnote 4.

in the indictment had been CSC, the enterprise element would be less of a problem. But the indictment claims the unincorporated, non-legal Infonet Division is the enterprise—no doubt because the government sought to include CSC as a defendant. The pattern of racketeering alleged by the government, if it advanced or benefitted any entity, it advanced CSC. The alleged misrepresentations regarding the software were made by CSC, not Infonet. All of Infonet's assets were owned by CSC, and any money paid under the NTS contract in no way benefitted or advanced Infonet separate and apart from the overall advancement of CSC as a whole. When looked at in this light it becomes clear that Infonet could not have been conducted "through a pattern of racketeering activity."

### D. *Mail Fraud*

In addition to the time-barred bribery allegation, the predicate acts on which the government relied to support the "pattern of racketeering activity" charge are the mail and wire fraud charges. Besides supporting the three RICO counts, these allegations are substantively charged in Counts 4 through 43.

The basis for the alleged mail fraud is that the defendants submitted false claims to the government by sending invoices through the mail and were paid by the government with checks sent by mail. The wire fraud is based solely on the fact that the service provided by CSC was delivered over the interstate wires. Counts 44 through 57 charge the defendants specifically under the false claims statute, 18 U.S.C. § 287.

The mail fraud counts are, in essence, false claims with the supposed addition of the use of the mails as an artifice to defraud. The government claims in Counts 4 through 27 that all of the defendants except for Blecker and Loux

for the purpose of executing [a] ... scheme and artifice to defraud, did know-

ingly cause to be delivered by mail through the Postal Service ... mail, matter and things, to wit: a check or checks drawn on the Treasury of the United States addressed to Computer Sciences Corporation. . . .

These checks were drawn for the purpose of paying CSC for computer services under the contract. The charges in Counts 38 through 43 include mailing of invoices for the alleged software fraud.

The mail fraud statute, 18 U.S.C. § 1341, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any Post Office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The offense has been called a "stopgap device" to be used "until particularized legislation can be developed and passed to deal directly" with a "new" type of fraud. *United States v. Maze*, 414 U.S. 395, 406, 94 S.Ct. 645, 651, 38 L.Ed.2d 603, 611 (1974) (Burger, C. J., dissenting). One district court added to this description to say that the mail fraud statute "was to protect the public, more precisely, the gullible public, against the various fraudulent schemes that the cunning trickster could devise." *United States v. Henderson*, 386 F.Supp. 1048 (S.D. N.Y.1974).[6]

The false claims statute provides:

---

**6.** Defendants have cited *Henderson* for its holding that the mail fraud provisions are not to be applied when the supposedly defrauded victim

is the United States government. This court has decided that it need not reach this issue in light of its disposition of the case.

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 287.

■ It is clear that the government can elect to charge a defendant under one or more statutes for a single offense if that offense overlaps more than one statute. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932); *United States v. Crew, et al.*, 538 F.2d 575 (4th Cir. 1976); *United States v. Ponder*, 522 F.2d 941 (4th Cir. 1975); *Coates v. State of Maryland*, 436 F.Supp. 226 (D.Md.1977). The only requirement is that "each offense proscribed [must require] proof of some fact that the other does not." *United States v. Ponder*, 522 F.2d at 943.

■ But it is also now clear that when a prosecutor is faced with an alleged offense which violates more than one statute with one being specifically tailored to the alleged offense involved, the prosecutor has no discretion to charge a defendant under any statute other than the specifically tailored one. *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).

*Simpson* involved defendants who had been charged, convicted and sentenced under 18 U.S.C. § 2113(d) for committing a robbery "by the use of a dangerous weapon or device." They also had been sentenced under 18 U.S.C. § 924(c) for using "a firearm to commit any felony." That provision provides for an additional sentence of one to ten years for the first offense or for two to twenty-five years for subsequent offenses. The additional sentence imposed under § 924(c) cannot run concurrently with the sentence imposed for the underlying felony.

In holding that the government could not prosecute the defendants under both statutes, the Court did not reach the identity of elements issue of *Blockburger*. Instead the Court avoided that question [7] and based its decision on legislative history, the leniency rule, and the principle that "the more specific statute" will be given precedence over a general provision which speaks "to the same concern." 435 U.S. at 15, 98 S.Ct. at 914, 55 L.Ed.2d at 78.

In *Busic*,[8] the Court extended *Simpson* to hold that the prosecutor may not choose his statute but must proceed under the more specific one.

Despite specifically declining to reach the identity of elements issue, the Court pointed out in both *Simpson* and *Busic* that the proof required under the two statutes was, in fact, identical.

The legislative history of the mail fraud statute is scanty at best. The predecessor to the present mail fraud statute was passed in 1889, Act of March 2, 1889, Ch. 393, 25 Stat. 873. The history as it is indicates that the statute was aimed principally at schemers who attempted to sell counterfeit currency through the mails. *See* H.R. Rep.No.1501, 50th Cong., 1st Sess. (1888); S.Rep.No.2566, 50th Cong., 2d Sess. (1889). It is obvious, therefore, that the mail fraud authors could not have contemplated its use in a setting such as the one before this court.

The false claims act is based on a 1909 statute, Act March 4, 1909, Ch. 321, § 35, 35 Stat. 1095, and its purpose was to protect funds and property of the government from fraudulent claims. *Rainwater v. United States*, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). There is nothing specifically in the legislative history that would indicate that it was intended either to supplement or

---

7. The Court avoided the issue because the *Blockburger* test goes to the question of double jeopardy—a constitutional question. Before reaching such an issue, of course, the Court will attempt to resolve a statutory question through non-constitutional analysis.

8. *Busic* also involved §§ 2113(d) and 924(c).

to replace the mail fraud statute vis-a-vis the government.

The rule of leniency requires that "doubt will be resolved against turning a single transaction into multiple offenses." *Bell v. United States*, 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).

> This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what congress intended.

*Lander v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 211, 3 L.Ed.2d 199, 200 (1958).

Under the rule of *Simpson* as amplified in *Busic*, this Court must apply

> The principle that gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern.

*Simpson v. United States*, 435 U.S. at 15, 98 S.Ct. at 914.

■ The elements of a mail fraud violation are: (1) formation of a scheme with the intent to defraud; (2) using or causing the use of the mails; (3) in furtherance of the fraudulent scheme.[9] The elements of a false claims violation under § 287 are: (1) making or presenting a claim against the United States or any agency or department thereof; (2) such statement must be false, fictitious or fraudulent; and (3) the defendant must know that his claim is false, fictitious or fraudulent.[10]

■ While a recitation of the elements of the two crimes would make it appear as if the offenses are somewhat different—thereby avoiding the *Blockburger* test—in practice, when the false claim is mailed to the government, the offenses are identical. The only difference between a false claim violation and a mail fraud violation, when the mail fraud is based on a false claim, is the use of the mails.

The indictment involved in this case charges the defendants with mail fraud by causing the Treasury Department to issue checks and send them through the mails. However, it is the policy of the Treasury Department to make *all* disbursements to contractors by mail. In the Department of the Treasury, Division of Disbursement Procedure Manual, Part 3, "Payment. Services and Operations" p. 34–24, it is written that

> It will be the policy of the Division of Disbursement to mail all checks to vendors. As a general rule, checks issued in payment of obligations of the United States must be mailed directly to the payees at their bona fide address. (See Comptroller General Decision A–83685, March 12, 1937.)

By virtue of this policy, any false claim submitted by a vendor will—as long as the false nature of the claim is not discovered immediately—cause a use of the mails by the Treasury Department.

The same is true for those counts of the indictment which charge software fraud. In these counts, however, the indictment does allege that invoices were mailed by the defendants. The gravamen of the offense, nevertheless, is presenting "a claim against the United States ... knowing such claim to be false, fictitious, or fraudulent." § 287.

Under the theory the prosecutors followed in this case, virtually all false claims charges could be transformed into mail fraud charges, with the attendant increase in penalties and with the potential for transforming great numbers of garden variety false claims cases into RICO cases. The prosecutors would have this court sanction a method of racheting an offense specifically proscribed into another offense so that it can bring it within a third statute—RICO—the penalties of which are vastly more serious and which would allow the government to subject the defendants to the forfeiture provisions. The use of this building block method in a criminal case requires close

---

**9.** For a discussion of the mail fraud elements see 18 Am.Crim.L.Rev. 199–205 (1980).

**10.** For a discussion of the false claims elements see 18 Am.Crim.L.Rev. 282–86 (1980).

scrutiny by the court, which is charged with insuring that the criminal justice system operates fairly. Accordingly, the court will not approve such a stretching of the acts involved in this case. It is the court's opinion that Congress did not intend to have mail fraud charges tacked onto all false claims charges, and certainly did not intend to have false claims charges become the basis for RICO charges. In fact, Congress excluded false claims from the list of offenses categorized as racketeering activities in § 1961(1).

The wire fraud allegations, which were brought pursuant to 18 U.S.C. § 1343, are subject to the same analysis as the false claims. Any time a computer company is providing services to the government and that company is alleged to have submitted false claims regarding that service, wire fraud, under the theory the prosecutors have followed in this case, could be charged. Still, the false claims statute is the more particularized statute under which the claims should be brought. Furthermore, the only involvement of the interstate wires in this case was the use of the wires to provide this service. There is no allegation that the service was in any way deficient or fraudulent. None of the false representations are alleged to have been communicated over the interstate wires. For this additional reason, therefore, § 1343 is inapplicable.

Having decided that neither the mail nor the wire fraud charges are proper, Counts 4 through 43 must be dismissed.[11]

The dismissal of these counts would alone require the dismissal of Counts 1 through 3, since the predicate acts on which the RICO charges were brought were the one incident of bribery and the mail and wire fraud incidences. This being the case, the court need not address the issue argued by defendants that the bribery allegation is barred by the statute of limitations and cannot be a predicate act for a RICO charge. Without the mail and wire fraud charges, the bribery allegation would be the only predicate act on which to base a RICO charge. There being only one, there can be no "pattern of racketeering activity."

For the reasons stated above, therefore, Counts 1 through 43 are hereby dismissed with prejudice. Because of the court's dismissal of these counts, it is unnecessary to

---

**11.** In making this decision, this court is aware of the Seventh Circuit's holding in *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir. 1978). In *Weatherspoon* the court held that a defendant could be charged with both mail fraud under § 1341 and making false statements in violation of 18 U.S.C. § 1001. That case, however, involved a different statute and presented less compelling reasons for following the *Simpson-Busic* reasoning. The case involved a fact situation involving a defendant presenting fraudulent certificates of attendance to the Veterans Administration for the purpose of receiving VA educational benefits. That case, unlike the case now before this court, did not involve a situation in which virtually anyone who violated § 1001 would *have* to violate § 1341 and thus have the offense pyramided as a matter of course.

The government also cites the court to *United States v. Huber*, 603 F.2d 387 (2d Cir. 1979) and *United States v. Precision Medical Laboratories, Inc.*, 593 F.2d 434 (2d Cir. 1978). In *Huber*, the defendant was charged with having violated RICO, §§ 1961, 1962(c), 1963 and 18 U.S.C. § 2, as well as the false statements statute, § 1341, and several other statutes. In short, the defendant was charged with submitting inflated invoices for hospital supplies to the hospitals which in turn were reimbursed by the federal government under the Hill-Burton Act, 42 U.S.C. § 291 *et seq.* The Second Circuit upheld the conviction without specifically addressing the argument raised by defendants in the case before this court. But in so doing the court clearly believed that the evidence had shown that the mail fraud had been committed when "the mails were used in connection with the scheme to defraud the hospitals." *Id.* at 391. Clearly that case is distinguishable since the hospitals were not being reimbursed 100% by the federal government, thus causing the hospitals to pick up a portion of the fraudulently inflated tab.

In *Precision Medical Laboratories*, the defendant was convicted of submitting false claims to the government in connection with laboratory services performed for patients covered by the Medicare and Medicaid programs. The indictment charged violations under § 287 and § 1341. While this case is more closely related to the case at bar than *Huber*, the defendant apparently never made the argument the defendants have made in the case before the court. The Second Circuit, therefore, did not address this question. For this reason, that case is of minimal value to this court.

address the other arguments the defendants made in this motion.

## II.

### THE CONDUCT ALLEGED AS FRAUDULENT WAS AUTHORIZED BY A REASONABLE INTERPRETATION OF THE CONTRACT

The defendants argue that all counts of the indictment should be dismissed as the conduct alleged as fraudulent was authorized by a reasonable interpretation of the contract. For this proposition, the defendants cite the recent Fourth Circuit decision in *United States v. Race, et al.*, 632 F.2d 1114 (4th Cir., 1980).

The *Race* decision involved a contract between Consolidated Services, Inc. ("CSI") and the Charleston, South Carolina Naval Supply Center. This contract secured the delivery of labor and services, indefinite as to quantity, time and materials but subject to an ultimate dollar limit.

The Navy, charging a violation of 18 U.S.C. § 1001, alleged that CSI charged the Navy a travel per diem rate greater than that it actually paid its employees. CSI argued that such a billing was authorized by the contract. The Court of Appeals noted that the "exact language of the clause is as clear-cut and precise as a careful drafter could make it" and was "convinced that the contract very clearly authorized CSI to bill the Navy" at the higher rate. At 1118, 1119. It noted that the clause in question involved "no words of art, but only words of common understanding, requiring no special expertise for their interpretation." *Id.* at 1119. Thus, it held that the meaning of the clause, "couched as this one is was in language of common use and understanding, was purely a matter of law for the court" and that the district court should have granted a motion to dismiss. *Id.*

The Court of Appeals stated further that had the provision been ambiguous, that is, susceptible of at least two reasonable interpretations, and had CSI's conduct come within one of those interpretations, it could not be held criminally liable under a reasonable doubt standard. The court noted that "one cannot be found guilty of a false statement under a contract beyond a reasonable doubt when his statement is within a reasonable construction of the contract." *Id.*

The NTS contract is not "clear-cut," "precise," or comprised of "words of common understanding." At this stage of the proceedings, it is impossible for the court to make a determination of what is and is not reasonable under the complex and technical NTS contract. The *Race* decision does not compel a district court to conduct a lengthy pretrial hearing to determine the meaning of a complex, highly technical contract where the identical issues will have to be put before the jury again if the matter is tried.

The *Race* decision is applicable to Counts 44 through 55 of the instant indictment just as the reasonable doubt standard is applicable. However, this motion is brought under Fed.R.Crim.P. 12(b). In order to prevail on this motion, the defendants must show a defect in the indictment. Counts 44 through 55 properly allege violations of 18 U.S.C. § 287 and no further inquiry need be made. Consequently, while the *Race* decision is applicable to these facts and while the contract should be construed by the court, the defendants' motion is more properly made under Rule 29 at the close of the government's evidence.

## III.

### COLLATERAL ESTOPPEL AND PROSECUTORIAL VINDICTIVENESS

Defendants Peter Loux and Herbert Blecker move to dismiss the indictment against them for two reasons not applicable to the other defendants. First, they claim that under the double jeopardy clause of the Fifth Amendment, the government is collaterally estopped from prosecuting this indictment. They allege that in an earlier prosecution, *United States v. Icarus Corp., et al.*, Cr. No. 79–137–A, Eastern District of Virginia, it was determined that Loux and Blecker had not conspired to defraud the

government. Secondly, these defendants contend that they have been deprived of due process of law as a result of prosecutorial vindictiveness. They allege that bringing this action after their vigorous defense in the earlier action at the least appears vindictive and hence the indictment should be dismissed.

These motions were argued on January 7, 1981. The motions were denied from the bench on that day. On January 30, 1981, these defendants, by counsel, proffered a digest of the transcript of the earlier action. By a bench ruling on February 13, 1981, the court opened the record to admit this digest and then treated the expanded record as though it was before the court as a motion for reconsideration.

After careful consideration of the briefs, arguments of counsel, the digest and the indictments, the court is of the opinion that Blecker's and Loux's motions should be denied.

### A. The Collateral Estoppel Motion

■■■ An indictment that involves essential elements of facts and law which have been tried and decided in an earlier case should be dismissed. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). In ruling on such a motion, the court must determine exactly what was decided at the earlier trial. *United States v. Davis,* 369 F.2d 775, 777 (4th Cir. 1966), *cert. denied,* 386 U.S. 909, 87 S.Ct. 858, 17 L.Ed.2d 783 (1967). It is the burden of the moving party to demonstrate that the issue they urge is foreclosed logically constituted the basis of the earlier jury verdict. *Id.* "Only those issues necessarily determined by the first jury are conclusive in a second trial." *Id.* However, "the inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *United States v. Davis,* 460 F.2d 792, 796 (4th Cir. 1972), quoting *Ashe v. Swenson, supra,* 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 476.

Defendants allege that the issue of whether there was any conspiracy to defraud the government was resolved against the government by the earlier trial. The government may not prosecute some aspects of the conspiracy in one case and, after an acquittal of the defendants, prosecute other aspects of the same conspiracy. Conspiracy is a single crime. *Short v. United States,* 91 F.2d 614, 622 (4th Cir. 1937).

■■■ As the court has dismissed the conspiracy counts of the indictment, the defendants' motion to dismiss on grounds of collateral estoppel is moot.

■■■ Even if the motion was not mooted, the defendants' assertion that the conspiracy involved in this action and the conspiracy involved in the earlier indictment are the same has no merit. The two indictments do involve overlapping periods of time and do occur in the same location. In the first indictment, the co-conspirators are alleged to be Icarus Corporation, Herbert Blecker, Peter Loux, and Paul Scanlon. In this indictment, the co-conspirators are Computer Sciences Corporation, John Luke, Erwin Allen, Thomas Marti, Norman Derrick, Peter Loux, and Herbert Blecker. In the first action the conspiracy allegation involves transactions between Blecker, Loux, Icarus and Scanlon to present false invoices to CSC who then, presumably innocently, would pass the invoices on to the federal government. Blecker and Icarus would falsify the resumes of Icarus Corporation employees. Loux would approve these resumes for CSC after which Loux and Blecker and Icarus would mail the inflated invoices from CSC to the GSA for payment.

In addition, Blecker allegedly paid kickbacks to Loux in exchange for Loux's generating work for Icarus Corporation under a contract between CSC and the government. Payments from Loux would then be made to Scanlon as president of Data Processing & Technical Consultants. Blecker and Icarus invoiced CSC for work performed, Loux would issue to Icarus a fictitious invoice from Data Processing & Technical Consultants. Upon receipt of that

invoice, Blecker and Icarus would draw a check payable to Data Processing & Technical Consultants.

While the second indictment also charges mail fraud and False Claims Act violations, the underlying conduct is totally different. In this criminal prosecution, Loux and Blecker allegedly conspired with Luke, Allen, Marti and Derrick and CSC to conduct Infonet's affairs through a pattern of racketeering activity. As a part of this pattern, they allegedly defrauded the government by increasing the amount charged for the use of the COST/BPS software system. Allegedly these defendants misled the GSA into believing that a new software product with additional features had been devised and that the old system was no longer available. The mail fraud substantive counts against Loux and Blecker include invoices submitted on different dates than those involved in the first indictment with the exception of one invoice. Lastly, this prosecution alleges that the other defendants along with Loux and Blecker presented a false claim to GSA for "application charges."

The conspiracy alleged in the first indictment relates to that of the second indictment only in that the same contract with the government was in question and defendants Loux and Blecker were involved. The scheme alleged in the second indictment is a different and totally unrelated scheme. The software product of Icarus, C OST or COST/BPS, was not at issue at all in the first indictment or trial, although there were scattered references to it. In the first indictment, the Icarus invoices were alleged to be fraudulent and that they were based upon false resumes. In the present indictment they are false in that the amount claimed for "application charges" was based upon a misrepresentation as to the nature of the software system. The first indictment only involved labor charges, as distinguished from the cost of the software program. The conspiracy involved in the instant indictment also differs from the first conspiracy in that CSC and its officers were not alleged to be members of the earlier Blecker-Loux conspiracy, and in fact were dupes of that scheme. In the instant indictment, the heart of the conspiracy is a scheme to conduct the affairs of CSC's Infonet Division through acts of racketeering.

Consequently, the court is of the opinion that no facts concluded in the former trial have again been put in issue in this case. As a result, no facts involved in the instant action can be held to be established by collateral estoppel.

### B. *Prosecutorial Vindictiveness*

The defendants argue that the indictment against Blecker and Loux should be dismissed because their right to due process of law has been violated as the conduct of the prosecutors contained a "realistic likelihood" of vindictiveness. Citing *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), they argue that the appearance of vindictiveness rather than vindictiveness in fact controls a determination of whether a defendant's due process rights have been violated. They urge that charging an individual with additional criminal acts after he has asserted his rights against an initial charge is prohibited, if the government knew the factual basis for the charges at the time of the initial decision to indict.

Where a defendant has exercised his rights, and the prosecutor, on the same facts, has indicted him on more serious charges, vindictiveness may be presumed. Thus, in *United States v. Johnson*, 537 F.2d 1170 (4th Cir. 1976), the prosecutor obtained a superceding indictment on the same facts where a guilty plea to drug charges was overturned on appeal. The Fourth Circuit there allowed the conviction to stand on the counts brought in the original indictment, but dismissed counts which were not present in the first indictment. In *United States v. De Marco*, 550 F.2d 1224 (9th Cir. 1977), the government obtained a superceding indictment on the same facts as the original indictment. These facts were known to the government before the first indictment was obtained. The Court of Ap-

peals held that due process required dismissal of the new indictment. In *United States v. Andrews*, 612 F.2d 235 (6th Cir. 1979), the defendants were allowed to make bail, despite the government's request that they not be admitted to bail. The government obtained a superceding indictment with a conspiracy count on the identical facts. This conduct was held to be impermissibly vindictive.

The situation presented here by the two indictments charging Loux and Blecker is very different. Two schemes are involved. The conduct involved is different and distinct. The co-conspirators are different. It is not clear that the government possessed information sufficient to bring this indictment at the time the Blecker-Loux indictment was returned. According to the affidavits submitted in opposition to this motion, twenty-nine interviews were conducted after the first indictment. Additional subpoenas duces tecum were issued and several additional witnesses testified to the grand jury.

Even assuming the government has produced sufficient evidence to indict both schemes at the same time, there is a strong argument that it should not have done so. The two prosecutions simply do not involve the same facts or the same acts. The prosecutors here have merely exercised their discretion to structure the prosecution of two totally different schemes with two different indictments.

 Lastly, an element of prosecutorial vindictiveness is that the later charges are the greater magnitude than the earlier charges. Given this court's ruling dismissing Counts 1 through 43 of the indictment, it cannot be said that the charges brought against Blecker and Loux are of a greater magnitude than those brought in the first indictment.

For these reasons, the motion of defendants Blecker and Loux to dismiss on grounds of prosecutorial vindictiveness is denied.

## IV.

## THE GRAND JURY WAS NOT FULLY INFORMED

All of the defendants move for a dismissal of the indictment on the ground that it was not properly found and concurred in by twelve or more informed grand jurors, as contemplated by the Fifth Amendment of the Constitution and Rule 6(f), Fed.R. Crim.P.

Specifically, the defendants allege that the twenty-nine page indictment returned by the grand jury in this case is so "incredibly arcane and complex, both in terms of the statutory offenses charged and in terms of the facts alleged" that it is impossible for lay grand jurors to make an informed, independent determination of the matters contained in the indictment.

The court finds no merit in the defendants' contentions. To accept the position is to hold that the presence of technical terms in an indictment gives rise to a presumption that a lay jury cannot fulfill its mission. Such a holding would require that a grand jury always be composed of experts in the field in which those under investigation are engaged. To hold that the legal theories set forth in this indictment are not comprehensible to lay people would require that, in any minimally complex case, the grand jury be composed of criminal lawyers. The court finds no need in this case for such a blue ribbon panel. Neither does the Fifth Amendment contemplate such a grand jury.

 The indictment here is perfectly regular on its face. An indictment regular on its face is not subject to challenge on grounds of the adequacy of the evidence, e. g., *Reyes v. United States*, 417 F.2d 916 (9th Cir. 1969); *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975); *United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976); *United States v. Radetsky*, 535 F.2d 556 (10th Cir. 1976); *United States v. Herbst*, 565 F.2d 638 (10th Cir. 1977); *United States v. Fried*, 576 F.2d 787 (9th Cir. 1978); *United States v. Gallagher*, 602 F.2d 1139 (3d Cir. 1979).

■ Defendants ask that the court conduct a full-blown trial to determine what evidence was presented to a grand jury in any instance where technical terms are repleat in the indictment or where multiple offenses are charged. The court declines that invitation.

## V.

### JURY SELECTION PROCEDURES

All defendants have moved to dismiss the indictment, alleging that jury selection procedures in the Eastern District of Virginia violate federal law and the Constitution of the United States. Specifically, defendants allege a violation of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq., and of the Fifth and Sixth Amendments to the Constitution.

### A. *The Eastern District of Virginia Jury Selection Plan*

The United States District Court for the Eastern District of Virginia adopted a written plan for random selection of grand and petit jurors entitled "Plan Proscribing Method for Composition of Jury Wheels and Selection of Jurors in All Divisions of This District in Accordance with the Jury Selection and Service Act" (hereinafter the "Plan"). The Plan provides that the "source list" of potential jurors is to be compiled from the voter registration list of the Eastern District of Virginia. A master jury wheel is selected, consisting of names drawn directly from the source list. The master wheel is large enough to satisfy estimated juror needs for a period of at least six months and up to two years. From time to time, at the direction of the Clerk of the Court, names and addresses are drawn from the master wheel and juror qualification questionnaires are mailed to these people in order to compile a "qualified wheel."

The Clerk examines the completed and returned questionnaires and eliminates people who must be excluded because they are statutorily disqualified or exempt. Congress has exempted those who have not resided in this jurisdiction for at least a year or who cannot speak English or are so illiterate that they cannot fill out the qualification form or are incapable because of mental or physical infirmity or are convicted felons. 28 U.S.C. § 1865(b). Congress also exempted three groups of citizens: members of the armed forces, policemen and firemen and public officials. 28 U.S.C. § 1863(b)(6).

Other people are eliminated because the Plan, purportedly in conformity with 28 U.S.C. § 1863(b)(5), allows these people a privilege to excuse themselves from jury duty by making a request for an excuse on the returned questionnaire. The Plan gives nine occupational groups—lawyers, doctors, dentists, pharmacists, nurses, school teachers and supervisors, clergy, morticians, and some individuals engaged in the movement of interstate commerce—the privilege of excusing themselves. In addition, before the March 10, 1980 amendments to the Plan, all females with legal custody of a child twelve years of age or younger were allowed to excuse themselves.[12]

Those persons who are not eliminated on the basis of the questionnaire are placed on the qualified wheel. Random drawings from this wheel produce the names of persons who are then summoned to appear for service as grand or petit jurors. Anyone who is actually summoned for jury service under 28 U.S.C. § 1866(c)(1) may be excused by the court by a personal showing of undue hardship or extreme inconvenience.

### B. *The Constitutional Challenge*

■ The Fifth and Sixth Amendments to the Constitution entitle defendants in criminal cases to grand and petit juries selected at random from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The standard for determining when the Sixth Amendment requirement to a fair cross section has been violated is provided

---

12. The Plan now provides for the exclusion of all persons having legal custody of a child the age of ten or under. The grand jury in this case was selected before the amendment.

by *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed. 579 (1979):

In order to establish a prima facie violation of the fair-cross section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

■ Fifth Amendment "Due Process" cases differ from Sixth Amendment cases in that a discriminatory purpose is an essential element of the violation. *Casteneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). It is a defense to a Fifth Amendment case that the government had a non-discriminatory purpose while in the Sixth Amendment context, "systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section." *Duren v. Missouri, supra,* 439 U.S. at 368, n. 26, 99 S.Ct. at 670, n. 26.

■ The defendants do not allege, and this court does not find, any discriminatory purpose in allowing these ten groups of individuals to excuse themselves from jury service. The Court's purpose in formulating the Plan was to provide juries drawn from a broad cross section of society while minimizing delays and expense to the justice system and undue hardship to those subject to service. The Plan thus does not violate the Fifth Amendment.

Despite the great wealth of legal talent and energy in the large group which makes up the defense team, the defendants have provided the court no evidence regarding the representation of the excluded occupational classes and women with young children in the qualified wheel from which jurors are summoned. They have also not presented the court with any evidence regarding the representation of these groups in the voter registration list of the Eastern District of Virginia. Rather, they provide data from the 1970 census regarding the work force of the entire Commonwealth of Virginia. Aggregating all of the excluded occupational groups from Virginia's work force in 1970, these groups represent 9.1% of the labor force. Regarding mothers with children under twelve, defendants represent that the 1970 census report for Virginia shows that 40.5% of the 1,654,442 women in Virginia over the age of sixteen have children under the age of seventeen.

Defendants' statistical showing simply fails to make out a prima facie case. The court has no basis on which to conclude who is and is not represented in the qualified wheel. The defendants have not represented to the court that the Clerk of the Court has been unwilling or unable to provide data on the qualified wheel. Instead, the defendants complain that Virginia, unlike Massachusetts, does not keep such information on a computer. An alleged lack of sophisticated data retrieval does not give this court license to base a decision upon ten year old data regarding the work force of the entire state when the relevant concern is current data on the voter lists and the qualified wheel of this District.

Thus, the court need not reach the first and third concern of *Duren v. Missouri, supra.* There is no need to decide whether each of the occupational groups or, as defendants claim, the aggregate of the excluded groups is a "distinctive" group in the community. Neither does the court have to determine whether an unproven representation is the result of systematic exclusion.

It is the burden of the defendants to establish a prima facie case. *United States v. Smaldone,* 485 F.2d 1333, 1547 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). Defendants have failed to meet that burden and their motion must be denied.

### C. *The Statutory Challenge*

■ The Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. (hereinafter "the Act"), establishes the require-

ments for the selection of grand and petit jurors to serve in the federal courts. Section 1861 sets forth the policy of the United States to entitle "all litigants in the federal court [to] have the right to grand and petit jurors selected at random from a fair cross section of the community in the district or division wherein the court convenes." Further "all citizens shall have the opportunity to be considered . . . and shall have an obligation to serve as jurors." Exclusion from service on the basis of race, color, origin, sex and national origin or economic status is explicitly prohibited by § 1862. Section 1863 provides that each United States District Court shall devise a plan for random jury selection. Section 1863(b)(5) states that the court shall specify

> Groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof and excuse of members . . . would not be inconsistent with sections 1861 and 1862.

Section 1867 provides that in criminal cases a defendant may move to dismiss the indictment or to stay the proceedings against him on the ground of a substantial failure to comply with the Act. This section also allows the moving party to present a "sworn statement of facts which, if true would constitute a substantial failure to comply with" the Act. In addition, the movant can present the testimony of the jury commission or the clerk and make use of "any relevant records and papers not public or otherwise available used by the jury commission or the clerk and any other relevant evidence."

The exclusion of the occupational groups and of women with young children rests upon a factual finding by this court that jury service by these groups would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice. The de-

fendants must thus show that this finding by the district court is clearly erroneous. Other courts have held that exclusion of these same professional groups was not clearly erroneous. *United States v. Goodlow*, 597 F.2d 159, 162 (9th Cir. 1979), *cert. denied*, 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979). The finding as to women with children was upheld in *United States v. Test*, 550 F.2d 577, 595 (10th Cir. 1976), cited generally with approval in this circuit in *United States v. Coats*, 611 F.2d 37 (4th Cir. 1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). Defendants have made no attempt to show that this court's reasoning is clearly erroneous.

In addition, *United States v. Test, supra*, holds that the standards for determining the validity of a jury selection plan under the Constitution and under the Act are identical. Thus, defendants have no more made out a prima facie case that the Plan violates the Act than they have that it violates the Constitution. Once again, the court can make no decision when it has not been provided with the data upon which the decision should be made. *United States v. Goodlow, supra*, at 162.

Defendants' motion under the Act to dismiss the indictment is also denied.

## VI.

### UNAUTHORIZED PERSONS INVADED THE SECRECY OF THE GRAND JURY PROCEEDING

Defendants have moved the court for a dismissal of the indictment on the grounds that unauthorized persons invaded the secrecy of the grand jury proceedings in violation of Rule 6, Fed.R.Crim.P.

Five intrusions of the grand jury have been pointed out. Of these five, four were by individuals presumably under the control of the Assistant United States Attorney. These four persons were never informed on the record that they should not come into the room. In three instances, documents were delivered to the prosecutors. These four instances, one by an unidentified wom-

an and three by United States Marshals, all interrupted or occurred during the taking of testimony.

The five instances are as follows:

*Incident # 1.*

On July 12, 1979, Paul N. Zeitlin was called to testify before the grand jury which returned this indictment. The transcript of that appearance, at page 12, reveals the following incident:

Q: Could you give us a, a layman's definition of an algorithm?

A: It's, it's a well-defined procedure.

Q: Do you—

A: You know, where, where there's nothing that says, "Toss a coin," or, or, you know, what phase of the moon it is, or, or something like that.

Q: Okay. In what context at CSC are the terms "algorithm" used?

(Whereupon, an unidentified woman entered the Grand Jury room; remarks were made toward Mr. Leiser on an unrelated matter off the record. The woman left the Grand Jury room, after which the following occurred:)

MR. LEISER: Just, just for the record, this is return of a document that was subpoenaed by this Grand Jury with the return dated this date and hand-delivered to us by an un-named individual who just came in the Grand Jury.

BY MR. LEISER (Resuming):

Q: Mr. Zeitman, [sic] the question I, I believe I asked you is: In what context at CSC are the terms "algorithm" or "algorithms" used?

\*　　\*　　\*　　\*　　\*　　\*

*Incident # 2.*

On pages 57–58 of the transcript of Mr. Zeitlin's testimony there appears the following transaction:

Q: Mr. Zeitlin, do you know whether or not the Government group of weights were changed throughout the life of the contract? In other words, were there various changes to that Government group of weights? We know that there was a difference

in that there were two; one group commercial, one group Government. The question now is whether or not the Government group was changed.

(Whereupon, at 11:00 a. m. a U.S. Marshal entered the Grand Jury room, handed a document to Mr. Leiser, after which the following occurred:)

THE MARSHAL: Mr. Leiser.

MR. LEISER: Yes.

(Whereupon, the Marshal left the Grand Jury room, after which the following occurred:)

MR. LEISER: Just so the record's clear, I just received a message from one of the Marshal's.

\*　　\*　　\*　　\*　　\*　　\*

*Incident # 3.*

On August 30, 1979, Thomas W. Fife appeared before the grand jury and the following episode occurred, as reflected on pages 3–4 of the transcript:

PROCEEDINGS

9:36 a. m.

MR. LEISER: Mr. Fife, just step in here, please. The forelady will swear you in if you just put your left hand on the Bible and raise your right.

(Whereupon, an unidentified male entered the Grand Jury room.)

A JUROR: We've got a maintenance man.

MR. LEISER: One second. One second please.

UNIDENTIFIED MALE: I'm from building maintenance. I understand you have a complaint about the—

MR. LEISER: Yes, it's too hot in here. There seems to be no air conditioning and we've got a Grand Jury that's presently—

UNIDENTIFIED MALE: It's 78 degrees.

MR. LEISER: Okay. Fine. If that's as cool as you can get it, we'll accept that. You've got to leave the Grand Jury room.

UNIDENTIFIED MALE: Okay, you know. I had to check out a complaint. If you all have a complaint, I have to check it out.

MR. LEISER: Okay, fine. If you could make it any cooler, we'd appreciate it.

UNIDENTIFIED MALE: No sir.

MR. LEISER: If you can't—

UNIDENTIFIED MALE: No Sir.

MR. LEISER: Okay, thank you.

(Whereupon, the above unidentified male left the Grand Jury room, after which the following occurred.)

MR. LEISER: Mr. Fife, if you'll—

THOMAS W. FIFE, called as a witness by the Government, having been first duly sworn, was examined and testified as follows:

\* \* \* \* \* \*

*Incident # 4.*

On April 3, 1980, Clinton DeGabrielle was called before the grand jury. As set forth on pages 22–23, the grand jury proceedings were again interrupted by an outsider:

A: Let me try and give you an example in lay terms. If you take a standard truck and you add an oversized back end to it and that cost you "Y" number of dollars and you keep using that truck until whatever your need is requires more capacity and you make an overt decision rather than to buy a second truck—

(Whereupon, a Marshal entered and left the Grand Jury room.)

THE WITNESS:—you're going to increase the capacity of the back end, . . . .

\* \* \* \* \* \*

*Incident # 5.*

On August 13, 1980, Mr. Kenneth Walls appeared before the grand jury and the following intrusion was recorded at page 5.

Q: Referring to the period of time when you were Director of Operations, that is from sometime in 1973 until 1977, what was your function as Director of Operations?

A: I was responsible for the operation of computer centers,—

(Whereupon, at 11:21 a. m. there was a knock on the Grand Jury room door, after which the Marshal opened the door, and passed unidentified documents to Mr. Lynch, and left the room, after which the following occurred:)

BY MR. LYNCH (Resuming):

Q: Yes, sir, continue.

\* \* \* \* \* \*

Rule 6(d), Fed.R.Crim.P., explicitly limits the persons who may enter the grand jury room while it is in session:

(d) *Who May Be Present.* Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no other persons other than the jurors may be present while the grand jury is deliberating or voting.

A long standing and well recognized rule in the federal courts is that the mere appearance of an unauthorized person before a grand jury is a sufficient ground for dismissing an indictment. *United States v. Echols,* 542 F.2d 948, 951 (5th Cir. 1976); *Latham v. United States,* 226 F. 420, 422 (5th Cir. 1915); *United States v. Furman,* 507 F.Supp. 848, D.Md.1981; *United States v. Phillips Petroleum Corp.,* 435 F.Supp. 610, 618 (N.D.Okl.1977); *United States v. Braniff Airways, Inc.,* 428 F.Supp. 579 (W.D.Tex.1977); *United States v. Kazonis,* 391 F.Supp. 804, 805 (D.Mass.1975); *United States v. Bowdach,* 324 F.Supp. 123, 124 (S.D.Fla.1971); *United States v. Borys,* 169 F.Supp. 366 (D.Alaska 1959); *United States v. Carper,* 116 F.Supp. 817 (D.D.C.1953); *United States v. Amazon Industrial Chemical Corp.,* 55 F.2d 254, 261–62 (D.Md.1931); *United States v. Edgerton,* 80 F. 374 (D.Mont.1897). These courts have noted that it is nearly impossible for an accused to prove actual prejudice as a result of the presence of the unauthorized person. Rather, the presence of the unauthorized person has been held to result in a presumption of prejudice; or, at the most, the accused must show "probable prejudice." *United States v. Edgerton, supra; United States v. Carper, supra; United States v. Borys, supra.*

However, "probable prejudice," as applied, does not mean that it is more likely than not that an accused has suffered actual prejudice. Rather, probable prejudice is supplied by a showing that "there may have been improper influence or suggestion in the grand jury room while a witness was testifying." *United States v. Edgerton, supra; United States v. Borys, supra,* 169 F.Supp. at 368; *United States v. Isaacs,* 347 F.Supp. 743, 749 (N.D.Ill.1972). Another court has held that a defendant need only show "probable prejudice to the grand jury system." *United States v. Carper, supra,* 116 F.Supp. at 820.

The government in its brief urges that an indictment should be dismissed only when there is a sustained presence of an unauthorized person in the grand jury room that results in improper influence. It contends that the intrusions here were momentary and carry no possibility of improper influence as no one, "except perhaps the marshal" who opened and closed the door heard testimony. The government contends that these facts should be treated as those in *United States v. Rath,* 406 F.2d 757 (6th Cir. 1969). In *Rath,* an attorney, waiting for another proceeding in the courthouse wandered into the grand jury room. The Assistant United States Attorney immediately halted proceedings and told the man to leave. The man left within twenty seconds of his entry.

█ With the exception of the intrusion by the maintenance man, the intrusions here are different from the brief, inadvertent *Rath* intrusion. Here, four of the five intrusions were by persons under the control of the United States Attorney. Three delivered documents and/or messages to him. Whenever persons obviously under control of the government flagrantly invade the grand jury, without reprimand, there is a possibility of undue suggestion or influence. When the government allows its supportive personnel to enter where a target witness's attorney or a child witness's mother or a juror's spouse may not, there is a great probability of, perhaps even certain prejudice to the grand jury system.

"The fact that grand jury proceedings are secret, *ex parte* and largely under the control of the federal prosecutor, magnifies [the] concern" the court must show "... for the right to indictment by an unbiased grand jury." *United States v. Serubo,* 604 F.2d 807, 816 (3d Cir. 1979). "[T]he grand jury is not meant to be the private tool of a prosecutor." *United States v. Fisher,* 455 F.2d 1101, 1105 (2d Cir. 1972).

Neither should the prosecutor allow himself or his staff privileges before the jury that its members or witnesses are denied. To allow marshals and an "unidentified woman" to interrupt a witness's testimony before the grand jury to deliver documents to or to have off the record conversations with the prosecutor is in gross violation of Rule 6 and destroys the secrecy and inviolacy of the grand jury proceedings. It is of no consequence that a witness has the good manners to stop in mid-sentence and not to resume speaking until the intruder is gone. The prosecutor's receipt of messages and documents while a witness is on the stand may have profound psychological effects upon the witness. The witness may feel the document or message refutes his testimony; he may feel his testimony is so unimportant that interruptions are allowed; he may lose his train of thought, and so forth. The grand jurors may be influenced by the greater privileges the prosecutor allows himself. They cannot receive mail or business correspondence during the proceedings. The prosecutor, perceived as having special privileges, could attain even greater control and influence.

Thus, the unreprimanded intrusions here carry a strong possibility of improper suggestion and a grave threat to the grand jury system. These facts bear no similarity to *United States v. Rath, supra.* In this instance the court must ignore the likelihood of guilt of the defendants. The economic burden of reindicting is equally irrelevant. The grave cost to society of sanctioning repeated, unreprimanded intrusions into the grand jury room of persons under the control of or acting for the convenience of the federal prosecutor requires that this indictment be dismissed.

On February 27, 1981, fourteen days after the court's bench ruling dismissing the indictment on grounds of invasion of the grand jury, the defendants moved under Rule 6(e), Fed.R.Crim.P. for disclosure of the remaining transcripts of the grand jury. That motion is denied. The defendants have shown more than that "grounds may exist for a motion to dismiss the indictment;" they have shown that such grounds do exist and their motion has been granted. The court's ruling would not be affected by the presence or absence of additional instances of invasion.

### CONCLUSION

In accordance with the order this day entered, Counts 1 through 43 are dismissed as to all defendants with prejudice; and dismissed as to the remaining defendants without prejudice.[13]

13. For reasons not discussed in this opinion, Counts 44 through 57 are dismissed as to defendant Derrick with prejudice.